RECORD NO. 14-2054

In The

# United States Court of Appeals
### For The Fourth Circuit

## ESCGOV, INC.,

*Plaintiff – Appellant*

**v.**

## BMC SOFTWARE, INCORPORATED,

*Defendant – Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA**

————————

## BRIEF OF APPELLANT

————————

Christopher A. Abel
Stephanie N. Gilbert
D. Sutton Hirschler, III
WILLCOX & SAVAGE, PC
440 Monticello Avenue, Suite 2200
Norfolk, Virginia  23510
(757) 628-5500

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. <u>14-2054</u>        Caption: <u>ESCgov, Inc. v. BMC Software, Incorporated</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>ESCgov, Inc.</u>
(name of party/amicus)



who is <u>Appellant</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐ YES ☑ NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: _Stephanie N. Miller_      Date: _10/9/14_

Counsel for: _ESCgov, Inc._

## CERTIFICATE OF SERVICE
****************************

I certify that on _October 9, 2014_ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Benjamin G. Chew
MANATT PHELPS & PHILLIPS, LLP
700 12th Street, NW, Suite 1100
Washington, D.C. 20005
Telephone: (202) 585-6511
E-mail: BChew@manatt.com
Counsel for BMC Software, Incorporated

T. Michael Guiffre, Esquire
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, D.C. 20037
Telephone: (202) 457-6441
E-mail: michael.guiffre@squirepb.com
Counsel for BMC Software, Incorporated

_Stephanie N. Miller_
(signature)

_10/9/14_
(date)

- 2 -

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION ...................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................... 2

STATEMENT OF THE CASE ............................................................... 3

       Statement of the Facts ................................................................. 4

SUMMARY OF ARGUMENT .............................................................. 14

STANDARD OF REVIEW .................................................................... 15

ARGUMENT ....................................................................................... 16

I.     THE DISTRICT COURT ERRED BY CONCLUDING THAT
      BMC's FACTUAL REPRESENTATION THAT ESCGOV
      LACKED RESALE RIGHTS WAS ACCURATE ......................... 16

     A.    There Exist Genuine Issues of Material Fact as to What
         DISA Meant when it used the Term "Authorized
         Reseller" in the 2012 Solicitation. ............................. 17

     B.    The District Court Failed to Consider BMC's Material
         Omission in Dismissing ESCgov's Claims ................... 24

     C.    Even if the 2012 Solicitation Required Bidders to Have
         the Explicit Right to Resell BladeLogic, There is
         Evidence that ESCgov Had Such Rights .................... 30

II.    THE DISTRICT COURT ERRED IN CONCLUDING THAT
      THE NON-DISPLACEMENT AGREEMENT WAS NOT
      SUPPORTED BY SEPARATE CONSIDERATION ...................... 32

i

A.    At the time ESCgov Purchased the BladeLogic License
        from BMC, the Parties Agreed Not to Take Any Action
        to Displace One Another From the DISA Contract..................33

B.    ESCgov and BMC had a Reciprocal Obligation under the
        Non-displacement Agreement not to Cause DISA to
        Abandon the BladeLogic Software...........................................34

CONCLUSION........................................................................................36

REQUEST FOR ORAL ARGUMENT ..................................................37

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby*, *Inc.*,
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ..............................15

*Choice Hotels Int'l*, *Inc. v. BSR Tropicana Resort*, *Inc.*,
252 F.3d 707 (4th Cir. 2001) ..................................................................16, 33

*Kowaleviocz v. Local 333 of International Longshoremen's Assn.*,
942 F.2d 285 (4th Cir. 1991) ........................................................................15

*Lujan v. National Wildlife Federation*,
497 U.S. 871 (1990)........................................................................................15

*Miller v. Leathers*,
913 F.2d 1085 (4th Cir. 1990) (en banc), *cert. denied*,
498 U.S. 1109 (1991) .....................................................................................15

*Seabulk Offshore*, *Ltd. v. American Home Assur. Co*.,
377 F.3d 408 (4th Cir. 2004) ........................................................................16

*Shaw v. Stroud*,
13 F.3d 791 (4th Cir. 1994), *cert. denied*,
513 U.S. 813 (1994).......................................................................................15

*Supinger v. Stakes*,
495 S.E.2d 813 (Va. 1998) .............................................................................14

**STATUTES**

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1332(a) ..............................................................................1

**RULE**

Fed. R. Civ. P. 56(c) ...........................................................................15

## STATEMENT OF JURISDICTION

The United States District Court for the Eastern District of Virginia had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a), as the parties are diverse and the amount in controversy exceeds $75,000. ESCgov, Inc. (hereinafter, "ESCgov"), the appellant, is a Virginia corporation with its principal place of business in McLean, Virginia. BMC Software, Inc. (hereinafter, "BMC"), the appellee, is a Delaware corporation with its principle place of business in Houston, Texas. ESCgov seeks more than $4.28 million in lost profit damages via its Amended Complaint.

The United States Court of Appeals for the Fourth Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. This is an appeal of a final order of a district court of the United States. The district court entered a Final Judgment (hereinafter, the "Judgment") on September 30, 2014 when it granted summary judgment to BMC for the reasons stated in an Opinion and Order dated August 7, 2014. The Judgment dismissed all five counts of ESCgov's Amended Complaint. The next day (October 1, 2014), ESCgov noted this appeal. The Judgment disposed of all of the parties' claims and is the final decision on this matter from which ESCgov's instant appeal is taken.

## ISSUES PRESENTED FOR REVIEW

1.  Did the district court err by engaging in an improper weighing of the evidence at the summary judgment stage and concluding that there was only one possible meaning of the term "authorized reseller" in a given government contract solicitation despite substantial testimony and documentary evidence suggesting a contrary interpretation?

2.  Did the district court err in concluding that BMC made no factually inaccurate statements sufficient to support a conspiracy, a breach of contract or a tortious interference claim, despite evidence that BMC intentionally omitted material information in a deliberate attempt to mislead a government agency?

3.  Did the district court err in making the factual determination that ESCgov had no right to resell BMC's software after 2009, even though the evidence was undisputed that ESCgov continued to provide BMC's software to the government, with BMC's assistance, continuously from 2009 to August of 2012?

4.  Did the district court err in concluding that the non-displacement agreement between BMC and ESCgov was not supported by adequate consideration?

## STATEMENT OF THE CASE

ESCgov filed its Complaint against BMC on October 29, 2013, stating claims for breach of contract, conspiracy and tortious interference arising out BMC's actions to usurp a government contract awarded to ESCgov by the Defense Information Systems Agency (hereinafter, "DISA").    Although BMC counterclaimed for breach of contract and unjust enrichment, those counterclaims were resolved by the parties and dismissed with prejudice before this appeal was taken.

On January 10, 2014, the district court granted BMC's Motion to Dismiss Counts IV and V of ESCgov's Complaint (alleging common law and statutory conspiracy).    On April 1, 2014, ESCgov obtained leave of court to file an Amended Complaint, reinstating those claims and amending ESCgov's prayer for relief.  On April 4, 2014, BMC filed a Motion for Judgment on the Pleadings and a Motion to Dismiss the reinstated conspiracy counts.  Both motions were denied on May 9, 2014.

BMC filed its Motion for Summary Judgment on June 5, 2014, which the court heard on July 3, 2014.  On August 7, 2014, the district court issued its memorandum opinion and order granting BMC's Motion for Summary Judgment and dismissing all counts of ESCgov's Complaint.  After BMC's counterclaims were dismissed, on September 30, 2014 the court entered final judgment for BMC.

**Statement of the Facts**

ESCgov is a systems integration firm that provides hardware, software and engineering services to various customers, including agencies of the United States Government.  Joint Appendix (hereinafter, "JA") 34.  One way ESCgov services its government customers is to provide software as a service (hereinafter "SaaS").  JA 35-36.  Under the SaaS model, ESCgov purchases licenses from software developers and then effectively "rents" the use of those licenses to its customer for a specific period of time.  *Id.*  For years, ESCgov's principal SaaS customer was the Defense Information Systems Agency (hereinafter "DISA").  JA 1136-37.  ESCgov began its relationship with DISA in 2008 under a contract it won by collaborating with BMC's predecessor, BladeLogic, Inc.  *Id.*

BladeLogic Inc. developed its namesake computer server automation software, "BladeLogic," which BMC describes as "the industry-leading solution for automated management, control, and enforcement of configuration changes in the data center….provid[ing] a cross-platform solution for managing both physical and virtual assets — in the traditional data center and in the cloud."  JA 35.  BMC acquired BladeLogic Inc. (and, as a result, ownership of the BladeLogic software) in April 2008.  *Id.*

In early 2007 ESCgov and BladeLogic, Inc. began working together to provide the BladeLogic software to DISA.  *Id.*  For its part, DISA had published a

request for proposals (hereinafter, the "2007 Solicitation"), seeking an effective way to standardize the configuration of its computer servers through the use of software it could use under the SaaS model. JA 35-36. Because BladeLogic, Inc.'s business model did not permit it to provide its products under a SaaS model, it needed to work with a middleman to do so—that middleman would be ESCgov. Working together, ESCgov and BladeLogic, Inc. crafted a successful bid in response to the 2007 Solicitation. As a result, in April of 2008 DISA executed a contract (hereinafter, the "First DISA Contract") by which ESCgov would provide it BladeLogic software on a SaaS basis. JA 36; *see also* JA 499-537. Under the First DISA Contract, ESCgov agreed to provide DISA the use of thousands of BladeLogic software licenses for a base period of one year, with DISA having the option to renew the agreement for two additional one-year periods. JA 36.

Not long after ESCgov was awarded the First DISA Contract, BMC acquired BladeLogic, Inc. *Id.* As a result, BMC stepped into its predecessor's role in assisting ESCgov to service the First DISA Contract. *Id.* As part of that collaboration, BMC and ESCgov entered into a "Perpetual License Agreement" in August of 2008. JA 37. Under that agreement, ESCgov agreed to purchase from BMC 20,000 perpetual BladeLogic software licenses for the purpose of servicing the First DISA Contract. *Id.* ESCgov issued a purchase order for the licenses (hereinafter, the "Purchase Order") on August 6, 2008. JA 62. BMC later

5

acknowledged that the Purchase Order, combined with GSA Schedule GS-35F-0553P (the approved scheduled filed by Four Points Technology, ESCgov's teaming partner for the First DISA contract), *see* JA 64-141, contained all the terms and conditions of the Perpetual License Agreement. JA 142. These documents secured for ESCgov the necessary authorization to provide BladeLogic to DISA in perpetuity. *See* JA 38-39, 62; *see also* JA 218-19. Because of the perpetual duration of the licenses sold to ESCgov, and the authority given to ESCgov under the Purchase Order to provide DISA (and *only* DISA) the right to use that software indefinitely, these contracts gave ESCgov the right to convey BMC's BladeLogic software to DISA by resale, SaaS, or any other means it chose. *See* JA 62, 64-141, 142.

Under the Perpetual License Agreement, ESCgov agreed to pay BMC a purchase price of $2,424,736.00 for 20,000 perpetual licenses. JA 62, 64-141, 142. Under that agreement, ESCgov also agreed to purchase from BMC BladeLogic training and consulting services for another $594,938.00, and maintenance for the licenses for an initial price of $436,452.00 per year. JA 62, 64-141, 142. Even though the First DISA Contract would expire on or before July 31, 2012, both BMC and ESCgov fully expected DISA to continue needing BladeLogic software for much longer than that. JA 38. Accordingly, BMC's price quote and ESCgov's Purchase Order specifically anticipated ESCgov's continuing to receive

6

maintenance support for its licenses from BMC for an indefinite period of time that extended well beyond July of 2012. *Id.*; *see also* JA 61, 62. Indeed, those documents clearly reflect the perpetual duration of the BladeLogic software licenses ESCgov purchased from BMC under the Perpetual License Agreement. JA 38; *see also* JA 61, 62.

Because ESCgov had to make a huge up-front payment for the BladeLogic licenses it was buying from BMC, both parties well knew that the profitability of ESCgov's contractual relationship with DISA would turn on ESCgov's ability to compete successfully for follow-on contracts with DISA—contracts that plainly were contemplated by BMC's price quote and ESCgov's purchase order. JA 61, 62. To be sure, ESCgov was careful to ensure that it would be in a strong position to compete for those subsequent DISA contracts that followed the First DISA Contract. JA 37, 60. As part of that effort and to ensure it had ample opportunity to recoup is multi-million dollar investment in BMC's BladeLogic software (and to protect itself from precisely the kind of avarice ultimately displayed by BMC in this case), ESCgov made it clear to BMC that, as a condition of ESCgov's purchase of 20,000 licenses from BMC, BMC must agree that during the term of the First DISA Contract it would not take any action to displace ESCgov from its role as a BladeLogic software supplier to DISA. JA 37, 60.

On December 15, 2008, BMC executed and delivered to ESCgov its formal acknowledgment of its agreement with ESCgov to refrain from doing anything to cause DISA to stop getting its BMC software from ESCgov for the duration of the First DISA Contract—the "Non-Displacement Agreement." JA 60. BMC further agreed not to intentionally assist any third party in competitively displacing ESCgov as the sole supplier of BladeLogic software to DISA during the First DISA Contract. *Id.* In exchange for those promises by BMC, ESCgov agreed that it would use its best efforts to ensure that DISA remained fully committed to BMC's BladeLogic software product and that BMC's technology would continue to be used by DISA in DISA's future procurements. *Id.*

Because DISA exercised both of its one-year options, the period of performance of the First DISA Contract ran continuously from February 1, 2009 through July 31, 2012. JA 553, 557. During that time BMC and ESCgov collaborated on pursuing various business opportunities with other government agencies interested in making use of BladeLogic on a SaaS basis. JA 39-40. In connection with those joint endeavors, BMC repeatedly held out ESCgov as an authorized reseller, distributor, or supplier of BladeLogic software and as an entity authorized to provide BladeLogic to end-users. JA 40.

In February of 2012, DISA issued a new solicitation (hereinafter, the "2012 Solicitation") for a contract (hereinafter, the "Second DISA Contract") to replace

the First DISA Contract when it expired on July 31, 2012. *Id.*; *see generally* JA 599-711. Unlike the 2007 Solicitation, the 2012 Solicitation included a requirement that qualified bidders needed to be "authorized resellers of BMC BladeLogic" notwithstanding that the successful bidder was not going to be selling (or *re*selling) any BladeLogic software to DISA. JA 40, 601. Rather, DISA sought to continue to "rent" BladeLogic software from a contractor under the SaaS model, and it wanted to ensure that whomever provided it that software was licensed by BMC to do so. JA 40.

On March 14, 2012, Ted Girard, BMC's Vice President for Federal Sales, met with ESCgov's senior executives at ESCgov's offices in McLean, Virginia to discuss collaborating on a bid for the Second DISA Contract. JA 41. When, during this meeting, ESCgov informed Mr. Girard that it had no need to purchase additional BladeLogic licenses to service the Second DISA Contract (given that, to date, DISA had needed no more than half of the 20,000 licenses ESCgov purchased from BMC in 2008) Mr. Girard demanded to know: "Then what's in it for me?" and "What happens if I go to somebody else?" JA 41-42. In response, ESCgov reminded Mr. Girard about BMC's non-displacement obligation, to which Mr. Girard replied, "So we're going to get legal?" or words to that effect. JA 42.

Unbeknownst to ESCgov (and directly contrary to BMC's obligation under the Non-Displacement Agreement), BMC had already begun looking for a new

business partner to displace ESCgov from its role as BladeLogic supplier to DISA. JA 1138. Indeed, immediately after meeting with ESCgov in March of 2012, Mr. Girard contacted ESCgov's competitor, Deloitte Consulting LLP (hereinafter, "Deloitte") to close a deal on BMC's selling Deloitte 16,500 BladeLogic licenses so that Deloitte could service the Second DISA Contract instead of ESCgov. *Id.* This deal by which Deloitte would be able to purchase thousands of discounted BladeLogic licenses from BMC in the event Deloitte was awarded the Second DISA Contract was negotiated and made while the First DISA Contract was still in effect and, as a result, during the period when the Non-displacement Agreement itself plainly was still in effect. *See* JA 38, 60.

Both Deloitte and ESCgov submitted bids for the Second DISA Contract. JA 44. Both bids contained proposals to provide BladeLogic to DISA on a SaaS basis. *Id.* Neither involved the sale or resale of software to DISA nor the passage of title to the software to anyone other than the prevailing bidder (ESCgov or Deloitte). *Id.* On July 24, 2012, DISA awarded the Second DISA Contract to ESCgov, after determining that ESCgov's price was substantially less than Deloitte's—indeed, more than $4 million less. *Id.*

BMC had a strong financial incentive to ensure that the Second DISA Contract was taken from ESCgov (which already had all the BladeLogic licenses it would need to service it) and awarded to Deloitte instead. *Id.* This is because

10

Deloitte would need to purchase thousands of BladeLogic software licenses from BMC—for millions of dollars—if Deloitte was awarded the Second DISA Contract. *Id.* Thus, just days after DISA awarded ESCgov the Second DISA Contract, BMC contacted Deloitte to discuss how Deloitte could protest that award. *See* JA 44-45. In the absence of a legitimate basis for contesting the award, they decided to leverage the ambiguous "authorized reseller" requirement DISA had added to the 2012 Solicitation. JA 45, 979. That term was not defined in the 2012 Solicitation, *see* JA 57, 599-711, and has no universally accepted meaning in the software industry, but BMC and Deloitte both knew that the 2012 Solicitation sought to ensure that the successful bidder was capable of continuing to provide DISA with BladeLogic software on a SaaS basis. JA 814; *see also* JA 878-80, 919-23. Even though ESCgov clearly had the ability and authority to meet DISA's needs—something both BMC and Deloitte knew well—at BMC's urging, Deloitte filed a protest with the Government Accountability Office on August 1, 2012 alleging that ESCgov was not an "authorized reseller of BMC BladeLogic." JA 45, 1153-62.

To support its protest, Deloitte asked BMC to provide it with an "unsworn" declaration stating that: 1) ESCgov "is not currently an authorized reseller of BMC BladeLogic"; 2) ESCgov was not "authorized reseller of BMC BladeLogic" from "February 22, 2012 through and including July 24, 2012"; and 3) ESCgov is not

11

authorized "to transfer BMC licenses by sale or through a service agreement to a third party." JA 792. BMC refused to provide the requested declarations. Instead, BMC drafted a deliberately ambiguous letter to Deloitte that conspicuously excluded any use of the term "authorized reseller." *See* JA 796. That letter, dated August 2, 2012, both puzzled and amazed DISA's employees familiar with ESCgov's long history of providing BladeLogic software to DISA with BMC's active support. JA 814-16. The letter claimed that ESCgov was not a "current BMC authorized partner for any solutions" and did not have "the right to resell BMC Products." JA 796. After DISA requested ESCgov to confirm what DISA had never before doubted—that ESCgov was an authorized reseller of BladeLogic—ESCgov provided DISA with an August 12, 2012 letter from BMC employee Sonja Taber that stated, in pertinent part, that "ESCgov is an authorized reseller of BMC support for the DISA license purchased in 2008." JA 982. When DISA called the obvious inconsistency between BMC's August 2 and August 12 letters to BMC's attention, BMC promptly advised DISA that Ms. Taber's August 12 letter was in error. JA 922.

Even though BMC and Deloitte chose to base Deloitte's bid protest on the ambiguous "authorized reseller" requirement, BMC was careful to avoid saying that Deloitte itself was "an authorized reseller of BMC BladeLogic." *See* JA 796. Its reason for not saying that was plain enough: Deloitte had no written contract

with BMC granting it resale rights for BladeLogic when Deloitte submitted its bid for the Second DISA Contract or when Deloitte submitted its protest of DISA's awarding that contract to ESCgov—a protest premised solely on ESCgov's allegedly not being an "authorized reseller." *See* JA 802, 963-65, 969-72. Even Deloitte recognized its obvious vulnerability on that score. *See* JA 802. To be sure, having worked with BMC illegally to wrest the Second DISA Contract from ESCgov because of the latter's supposedly not being authorized to resell BladeLogic, one Deloitte executive emailed another, "Just don't tell anyone that you also are not a blade logic [sic] authorized reseller." *Id.*

As a direct result of the bid protest and BMC and Deloitte's misrepresentation that ESCgov did not have the right to resell BladeLogic, DISA terminated its contract with ESCgov on August 29, 2012 and awarded the Second DISA Contract to Deloitte. JA 46. DISA would not have revoked its prior contract award to ESCgov but for BMC's misrepresentation regarding ESCgov's right to resell BladeLogic. *Id.* DISA relied exclusively on BMC's statements regarding ESCgov's relationship with BMC in erroneously determining that ESCgov was not an "authorized reseller of BMC BladeLogic." *Id.* As a result of BMC's actions, ESCgov's 20,000 perpetual BladeLogic software licenses were rendered worthless and ESCgov was deprived of more than four million dollars in profit it would have made over the life of the Second DISA Contract. JA 47, 52.

13

## SUMMARY OF ARGUMENT

ESCgov respectfully submits that the trial court erroneously usurped the role of the jury in this case by weighing evidence and making ultimate determinations of fact at the summary judgment stage. ESCgov presented to the court substantial proof in support of its claims for tortious interference and conspiracy—certainly enough to create genuine issues of material fact. But instead of drawing all inferences in ESCgov's favor, the trial court disregarded ESCgov's evidence and concluded that the misleading statements by BMC on which ESCgov based its claims were factually accurate. This single factual determination allowed the trial court to dismiss four of the five counts in ESCgov's Amended Complaint. The court made a second factual determination in concluding that ESCgov's breach of contract claim must be dismissed for lack of consideration, despite ample evidence that the parties had an express and binding agreement obligating each party to refrain from doing anything that could cause DISA to stop using BladeLogic software.

By deciding which evidence to credit and disregard at the summary judgment stage, the trial court denied the jury the opportunity to assume its essential roles of considering the arguments of each party, evaluating the credibility of witnesses, and assessing the damages to which ESCgov is entitled. *Supinger v. Stakes*, 495 S.E.2d 813, 815 (Va. 1998).

## STANDARD OF REVIEW

Because this appeal is based on the district court's grant of summary judgment, this Court should apply the same legal standards the district court employed when considering BMC's motion for summary judgment. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994), *cert. denied*, 513 U.S. 813 (1994); *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc), *cert. denied*, 498 U.S. 1109 (1991). To be sure, an appellate court reviews a district court's award of summary judgment *de novo*, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

An award of summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Where facts specifically averred by the nonmovant contradict facts specifically averred by the movant, the motion must be denied." *Kowaleviocz v. Local 333 of International Longshoremen's Assn.*, 942 F.2d 285, 288 (4th Cir. 1991) (citing *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). Moreover, at the summary judgment stage, the court must presume that *all* of the plaintiff's evidence is credible. *Miller*, 913 F.2d at 1087.

The standard of review of a district court's decision on an issue of contract interpretation also is *de novo*. *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 710 (4th Cir. 2001). "The interpretation of a written contract is a question of law that turns upon a reading of the document itself, and a district court is in no better position than an appellate court to decide such an issue." *Seabulk Offshore, Ltd. v. American Home Assur. Co.*, 377 F.3d 408 (4th Cir. 2004).

## ARGUMENT

For the following reasons, ESCgov respectfully argues that the judgment of the district court should be reversed and the case remanded so that ESCgov may pursue the full extent of the damages it suffered because of BMC's wrongful conduct.

## I.   THE DISTRICT COURT ERRED BY CONCLUDING THAT BMC's FACTUAL REPRESENTATION THAT ESCGOV LACKED RESALE RIGHTS WAS ACCURATE

The trial court concluded that BMC's representation that ESCgov lacked resale rights was factually accurate and that "no reasonable jury could find that BMC's representation about ESCgov's authorized-reseller status was false." JA 1137. In reaching this conclusion, the trial court made its own determinations of what the parties meant by the term "authorized reseller" and failed to consider significant evidence showing what DISA intended and what the parties understood

16

the term to mean—a meaning very much at odds with what the district court concluded its "plain meaning" to be. The trial court also failed to consider evidence that BMC intentionally mislead DISA by way of a material omission in order wrongfully to displace ESCgov from the Second DISA Contract.

The district court also erroneously concluded that "the record establishes that ESCgov did not have the right to resell BMC software since the parties' Partner Network Agreement ("PNA")—the only contract affording ESCgov resale rights—expired on April 30, 2009." JA 1145. In making the factual determination that ESCgov lacked the right to resell BladeLogic at the time of the 2012 Solicitation, the court disregarded evidence that the PNA was not germane to the BladeLogic software licenses purchased by ESCgov in August 2008 and that both parties intended ESCgov's right to resell BladeLogic to continue under the Perpetual License Agreement, regardless of the PNA's expiration date.

### A. There Exist Genuine Issues of Material Fact as to What DISA Meant when it used the Term "Authorized Reseller" in the 2012 Solicitation.

The record reflects a factual dispute as to what DISA meant when it used the term "authorized reseller of BMC BladeLogic" in the 2012 Solicitation. The trial court chose to interpret the term according to its "plain meaning," on the basis that there was no evidence suggesting that the parties intended to use the term in any other way. JA 1145-46. However, the evidence, when viewed in the light most

favorable to ESCgov, reveals a distinct factual dispute regarding the meaning of that term. In fact, the evidence suggests that there are at least three possible meanings of this ambiguous term,[1] including: (1) the ability to provide BladeLogic software to DISA, as opposed to a different software platform, on a SaaS model; (2) the existence of a "partnership" between the bidder and BMC with regard to the resale of BMC products; and (3) the explicit right to *resell* the BladeLogic software to DISA—which is the construction the trial court adopted.

The first interpretation is the meaning advanced by ESCgov and is the definition most supported by the evidence. According to the testimony of Anne Keller, DISA's Rule 30(b)(6) agency spokesperson, DISA included the language "authorized reseller of BMC BladeLogic" in the 2012 Solicitation to ensure that only contractors capable of providing *BladeLogic* software under an SaaS model could be awarded the contract. JA 897-98, 912-13. Ms. Keller's testimony is corroborated by a Market Research Report prepared by DISA shortly before the 2012 Solicitation, which determined that switching to alternative software at a time when DISA was already running BladeLogic on all of its servers would be prohibitively expensive. JA 885-90. The fact that the "authorized reseller" requirement was absent from the 2007 Solicitation is not supportive of an

---

[1] DISA did nothing to resolve that ambiguity by its omitting to make "authorized reseller" one of the 2012 Solicitation's defined terms. *See* JA 599-711.

18

alternative interpretation. Because the 2007 Solicitation did not identify a particular product to be provided (only the function the desired product had to perform), DISA did not need to specify in the earlier solicitation that the bidder must be authorized to provide "BMC BladeLogic." JA 808, 813, 897-98. In fact, the 2007 Solicitation anticipated that many different software companies (each with their own software product) would submit competing bids for the First DISA Contract. *See* JA 897-98. However, as confirmed by the Market Research Report, by the time DISA issued the 2012 Solicitation, DISA was fully committed to BladeLogic, making it essential that successful bidders possess the capability to provide *that particular product*. JA 885-90, 897-98.

Further supporting ESCgov's position is the clear evidence that DISA *had no intent to purchase the BladeLogic software outright* and, thus, a right to resell BladeLogic to end users was irrelevant to the Second DISA Contract. JA 913. When asked whether DISA required ESCgov "to have the right to resell BladeLogic licenses" in order to be an "authorized reseller" under the Second DISA Contract, Ms. Keller responded, "No. Our requirement was for the software and the solution, *not to be able to resell it. We weren't asking for that*." JA 912-13 (emphasis added). Likewise, ESCgov's Vice President testified that "authorized reseller" means having "the ability to deliver SaaS solution and provide BMC BladeLogic technology." JA 856-57.

19

Finally, the fact that DISA initially awarded the Second DISA Contract to ESCgov, whose proposed solution was to continue to provide BladeLogic to DISA on a SaaS basis, demonstrates that DISA interpreted the term "authorized reseller" just as ESCgov interpreted the term and that it had determined that ESCgov met the requirement. It is important to note that the 2012 Solicitation lacked any affirmative requirement that a bidder certify or provide evidence of its status as an "authorized reseller." *See generally* JA 599-711. To the contrary, the terms of the solicitation focused on the offeror's ability to provide BladeLogic software licenses to meet DISA's requirements using a software as a service model. *Id.* At no time during the procurement process did DISA ask ESCgov for some proof that it possessed "authorized reseller" status. *See* JA 725 (asking for proof that ESCgov was an authorized reseller for the first time *after* having awarded ESCgov the contract and then only because of Deloitte's pending protest).

It makes little sense to conclude that the 2012 Solicitation sought contractors who were authorized to perform a service that DISA neither wanted nor needed. Nevertheless, despite logic and straightforward sworn testimony in support of ESCgov's position, the trial court concluded that there was "no support in the record for understanding 'authorized reseller' as used in the 2012 Solicitation to refer to anything but the right to resell BladeLogic." JA 1145.

20

The second possible interpretation of the ambiguous "authorized reseller" requirement in the 2012 Solicitation is precisely the construction BMC manufactured in order to justify Deloitte's bid protest—*i.e.* that "authorized reseller" essentially meant any entity that appeared on an imagined roster of authorized BMC partners.[2] This construction was merely a product of BMC's and Deloitte's subversive tactics and was designed to give BMC veto authority over DISA's decision to award the Second DISA Contract to anyone other than who BMC told DISA to award it to. Thus, even though DISA had a different opinion as to the meaning of the term—and that opinion was consistent with ESCgov's interpretation of the term—BMC and Deloitte attempted to strong-arm DISA into accepting their contrived and misleading construction.

BMC and Deloitte realized they needed a means of causing DISA to revoke its award of the Second DISA Contract to ESCgov. Yet BMC also knew that ESCgov was perfectly capable of meeting the requirements of the 2012 Solicitation. So in an attempt to avoid a blatant misrepresentation obviously designed to coerce DISA into changing suppliers, the conspirators took a more subtle approach. In an artful attempt to disguise their fraudulent scheme, BMC

---

[2] Of course, no such roster actually existed. Instead, the closest BMC ever came to committing a list of those entities capable of providing the BladeLogic product to customers on an SaaS basis to writing was the July 2011 email list it provided DISA—a list that plainly included ESCgov. JA 924-32.

provided Deloitte with an ambiguous letter stating that "ESCgov…is not a current BMC *authorized partner* for *any solutions* (ESM and/or MSM)."    JA 796 (emphasis added).  BMC did not mention BladeLogic and it did not reference the authorized reseller requirement in the 2012 Solicitation.  *See id.*  BMC refused Deloitte's requests to state explicitly that ESCgov "is not currently an authorized reseller of BMC BladeLogic" and that ESCgov was not authorized "to transfer BMC licenses by sale or through a service agreement to a third party."  JA 792. Those misrepresentations would have been far too obvious to DISA.

The third interpretation, which is the construction erroneously accepted by the court below as undisputed, is that an "authorized reseller" is required to have the explicit right to resell BladeLogic software to end users.  JA 1146.  As explained above, this interpretation was far from undisputed and was, in fact, illogical in light of the prior dealings of the parties.

Interestingly, BMC never expressly took the position that authorized reseller status required the explicit right to resell until the commencement of this litigation, likely because it would be inconsistent with the undisputed fact that Deloitte, to whom DISA ultimately awarded the Second DISA Contract, did not have the express right to resell BladeLogic at the time of the 2012 Solicitation.  JA 802. The trial court failed to consider this factual disparity.  If DISA construed the term authorized reseller according to what the court deemed to be its "plain meaning," it

22

never would have awarded the Second DISA Contract to Deloitte and it also would not have initially awarded the contract to ESCgov pursuant to a proposal to provide BladeLogic software on a SaaS basis. Moreover, if BMC honestly construed the term in this fashion it would have granted Deloitte resale rights for BladeLogic software under Deloitte's Master Business Agreement or extended Deloitte's PNA to accommodate the alleged requirement—neither of which it did. JA 811.

BMC made a tactical decision to avoid expressly stating that ESCgov was not an authorized reseller of BMC BladeLogic because it wanted to be able to argue that DISA made that determination independently, and thereby avoid liability for breach of contract, tortious interference or conspiracy—exactly as it has done in this case. Unfortunately, the trial court fell directly into the conspirators' trap: it concluded that the statements made by BMC in connection with Deloitte's bid protest—*i.e.* that ESCgov was not an "authorized partner" and that it had "no right to resell BMC Products"—were technically accurate and therefore no liability could be imposed. Not only did this conclusion ignore evidence that ESCgov did have the right to resell BladeLogic to DISA under the Perpetual License Agreement, it also was a conclusion that the trial court was not permitted to make at the summary judgment stage. It is the prerogative of the trier of fact to weigh the evidence and determine whether BMC's statements amounted to accurate statements of fact or tortious misrepresentations.

**B.   The District Court Failed to Consider BMC's Material Omission in Dismissing ESCgov's Claims**

The sole basis for the district court's summary dismissal of ESCgov's claims for breach of the Perpetual License Agreement, tortious interference and conspiracy was that "no reasonable jury could find the representation [that ESCgov was not an "authorized reseller" to be] false…because the only contract affording ESCgov resale rights expired on April 30, 2009 . . . ." JA 1137.  However, even if the jury believed that BMC's affirmative statement that ESCgov did not "have the right to resell BMC Products" was factually accurate (which it was not, *see infra* Section I.C.), the jury still could conclude that BMC made a misrepresentation by omission because it (1) failed to inform DISA that ESCgov was fully licensed by BMC under the Perpetual License Agreement to meet DISA's needs under the Second DISA Contract, and/or because it (2) mislead DISA into believing that Deloitte possessed capabilities and authority with respect to the BladeLogic software that ESCgov did not.

It is undisputed that ESCgov is, and has been since 2008 when it purchased 20,000 licenses from BMC, capable of providing BladeLogic software to DISA on a SaaS model and that is had absolute authority to do so. *See* JA 62.  The Purchase Order gave ESCgov "a perpetual use license for [BladeLogic software] . . . to support its customer (DISA)." *Id.*  The Perpetual License Agreement gave ESCgov all the authority it needed to convey up to 20,000 BladeLogic licenses to

24

DISA by whatever means it preferred, including on a SaaS basis. Pursuant to that authority, ESCgov had provided the software to DISA for nearly four years prior to DISA's issuance of the 2012 Solicitation. JA 38. And once the 2012 Solicitation came out, ESCgov still had all 20,000 licenses it purchased in 2008 fully available to convey to DISA. JA 39.

Consequently, at the time DISA performed its market research in preparation for the Second DISA Contract and at the time it issued the 2012 Solicitation, DISA had no doubt that ESCgov was an authorized reseller of BMC BladeLogic. JA 895. Until BMC concocted its plan with Deloitte to displace ESCgov, even BMC did not dispute that ESCgov was an authorized reseller of BladeLogic. In July 2011, BMC included ESCgov on its "List of GSA *resellers* capable of providing BMC BladeLogic as a Saas." JA 924-26 (emphasis added). Even after Deloitte's bid protest was filed, BMC's own Sonja Taber, who, to BMC's dismay, apparently was not privy to her employer's conspiratorial machinations with Deloitte, sent a letter to DISA stating that ESCgov *was an authorized reseller*. JA 982.

Email exchanges between DISA and BMC immediately following Deloitte's bid protest make clear that DISA was misled by BMC's inconsistent statements, and that BMC deliberately perpetuated that misunderstanding. *See* JA 919-23. After reviewing the bid protest, the letters from BMC representing that ESCgov *was not* an authorized partner of BMC, and Ms. Taber's letter stating that ESCgov

*was* an authorized reseller, DISA's Deputy Legal Counsel sent an email to Ted Girard, BMC's Area Vice President of Federal Sales.   JA 922-23.   That correspondence expressed concern as to whether ESCgov "can provide the full extent of services needed on this contract" and requested clarification as to "whether ESCgov Inc. is a current authorized reseller of BMC products and the extent of the license that ESCgov Inc has with your company."   *Id.*   Although BMC testified that, at the time it received DISA's request, ESCgov *was capable* of providing the "full extent of the services" needed on the Second DISA Contract, JA 878-80, BMC responded by merely stating that "[t]he letter…dated August 9, 2012 which states that ESCgov is not a current authorized BMC partner is correct. The letter from Sonja Taber…was sent mistakenly."   JA 922.   BMC did not address DISA's concerns regarding ESCgov's ability to provide the services needed on the contract, *see* JA 919-23, concerns that could have been easily assuaged by pointing to the parties' Perpetual License Agreement, which gave ESCgov unlimited authority to provide BladeLogic to DISA in perpetuity.  JA 62, 64-141, 142.

Later BMC rejected another opportunity to clear up DISA's obvious misunderstanding.   DISA's counsel understandably remained confused after receipt of BMC's terse response to her email, so she more specifically requested a "current list of authorized resellers from BMC," pointing out that the list was

26

"invaluable to the Government because we have exclusively solicited and used BMC software since 2008…." JA 920-21. Although it could not be clearer that all DISA wanted was assurance that ESCgov, the bidder to whom it had awarded the Second DISA Contract, was able to provide it BladeLogic software, BMC continued to dance around the issue. This time BMC coyly directed DISA to its website for "BMC partner information." JA 920. Further confusion arose once DISA realized that Deloitte, who had previously represented it was an authorized reseller of BladeLogic, did not show up on BMC's internet roster of "partners." JA 919.

At no point did BMC attempt to clear up DISA's misunderstanding or reconcile its prior inconsistent statements by informing DISA that ESCgov indeed had the perpetual "right to provide to DISA the BladeLogic software in a software as a service model." JA 872-73. When asked why BMC never advised DISA of that fact (given that that is precisely what DISA was trying to determine), BMC's response was that, "We weren't asked that." JA 873. Of course, hiding behind that rationalization is entirely consistent with BMC's obvious sensitivity to its having carefully and cynically manipulated DISA into taking the Second DISA Contract away from ESCgov and awarding it to Deloitte, despite its knowing that ESCgov could have provided DISA BladeLogic on a SaaS model for four million dollars less of the taxpayers' money.

Many DISA representatives began to question BMC's motives early on but felt as though their hands were tied by BMC's coercive tactics. On August 8, 2012, Johnny McCormick, with DISA's Enterprise Services Division, questioned whether DISA should believe BMC's representations that ESCgov was not an authorized reseller. *See* JA 983-85. Mr. McCormick pointed out that the same "partner tool" that BMC used to establish that ESCgov was not an authorized reseller—*i.e.* the list of "BMC partners" on BMC's website on which ESCgov's name did not appear—also failed to list Deloitte. JA 983. Mr. McCormick further noted that, regardless of what the partner tool said, BMC previously had represented to DISA that ESCgov *was* an authorized reseller. *Id.* He ultimately concluded: "[I]t's BMC's inability to allow ESC to serve us that is the issue…To me, it looks as if BMC is forcing us to Deloitte which would increase their revenue." JA 986.

On August 6, 2012, DISA's Contracting Officer, Carrie Ross, also questioned BMC about its inconsistent statements. *See* JA 987-96. After a telephone conversation in which BMC represented that ESCgov "was not nor ha[d] been an authorized reseller, since 2009," Ms. Ross referred back to BMC's July 2011 "List of GSA resellers capable of providing BMC BladeLogic as a SaaS" *which specifically identified ESCgov*. JA 987. Given the conflicting representations, Ms. Ross stated that "[i]t is by the Governments amazement that

ESCgov is not an authorized reseller," and invited BMC to "[p]lease feel free to correct any misinterpretation or if I have misspoke" in reciting the clear evidence that ESCgov was authorized to service the Second DISA Contract. *Id.* Once again, BMC declined the opportunity to clear up the confusion it had created deliberately and give DISA the assurance BMC knew it was asking for: that ESCgov was fully capable of servicing DISA under the Second DISA Contract, by either reselling to DISA the licenses ESCgov obtained under the Perpetual License Agreement, or continuing to provide BladeLogic to DISA on a SaaS model.

BMC's repeated material omissions in furtherance of its conspiracy with Deloitte deliberately misled DISA into believing that ESCgov was not authorized to meet DISA's needs, when ESCgov was just as qualified to service the Second DISA Contract as BMC's hand-picked replacement—Deloitte. Although some DISA employees expressed skepticism and "amazement" regarding BMC's representations, in the end DISA relied on BMC's misleading statements in retracting its award of the Second DISA Contract to ESCgov and in granting the award of that contract to Deloitte instead.

**C.    Even if the 2012 Solicitation Required Bidders to Have the Explicit Right to Resell BladeLogic, There is Evidence that ESCgov Had Such Rights.**

The trial court made the conclusory observation that "the parties' Partner Network Agreement ("PNA")—the only contract affording ESCgov resale rights— expired on April 30, 2009," JA 1145, but the PNA was not the governing agreement with regard to ESCgov's purchase of BladeLogic software to service the First DISA Contract. *See* JA 218-20.  ESCgov already owned 20,000 BladeLogic licenses months prior to the execution of the PNA—licenses that were perpetual in duration. *See* JA 62.  ESCgov's rights with regard to the 20,000 BladeLogic licenses were established by that Perpetual License Agreement, which gave ESCgov unlimited and perpetual authorization to convey BladeLogic software to DISA by any method and contemplated that ESCgov and DISA would receive maintenance and support for those licenses for an indefinite period of time (extending well beyond the three-year projected lifespan of the First DISA Contract).  JA 62, 64-141, 142.  The PNA does not supersede the Perpetual License Agreement nor mention the terms and conditions of that agreement (or the related Quote or Purchase Order) at all. *See generally* JA 438-53.

Furthermore, ESCgov's Vice President testified that the PNA did not have any bearing on the perpetual licenses ESCgov purchased in 2008.  JA 861-62.  The PNA was merely a global agreement establishing pricing discounts for BMC

30

technology and did not contemplate the ESCgov's purchase of any new software from BMC. *See* JA 192-95, 839-40. Accordingly, even after the PNA expired, ESCgov "conducted its business in the same manner as an authorized reseller of their [BMC] technology." JA 842.

Under the court's interpretation, ESCgov had no right to resell any BMC technology after April 30, 2009. JA 1145. However, the evidence is undisputed that ESCgov continued to provide BMC's BladeLogic to DISA in 2010, 2011 and 2012. *See* JA 544, 553, 557. ESCgov did so pursuant to the rights it obtained under the Perpetual License Agreement, with the full cooperation and support of BMC. *See* JA 62, 64-141, 142. Moreover, on several occasions after the PNA expired BMC represented to DISA that ESCgov was an authorized reseller. *See* JA 982, 988-89. Specifically, BMC identified ESCgov to DISA as an authorized reseller of BladeLogic in July 2011 and again on August 12, 2012 when Ms. Taber confirmed via letter that ESCgov was an "authorized reseller." *See* JA 982, 988-89. It was only after BMC realized Ms. Taber's letter would spoil BMC's scheme with Deloitte to displace ESCgov from providing BladeLogic to DISA that the letter was identified as factually incorrect. JA 922. BMC also held ESCgov out as an authorized reseller during the parties' joint marketing efforts that took place from 2008 into 2012. JA 39-40. BMC's confirmation on several occasions and in several different media that ESCgov was an authorized reseller many years after

31

the expiration of the PNA cannot be reduced to or discounted as a mere oversight on its part.

Thus, even if the trial court was correct in its interpretation of the 2012 Solicitation to include an illogical and unnecessary requirement that bidders have the right to *resell* BladeLogic (despite the undisputed fact that DISA had no intention of *purchasing* any software to service the Second DISA Contract), there is conflicting evidence in the record as to whether ESCgov actually possessed BMC resale rights. The jury has the function of deciding whether ESCgov actually lost its resale rights after the PNA expired (and therefore provided BladeLogic to DISA without authority and with BMC's active support for three years). As a result, such a factual determination should not have been made at the summary judgment stage.

## II. THE DISTRICT COURT ERRED IN CONCLUDING THAT THE NON-DISPLACEMENT AGREEMENT WAS NOT SUPPORTED BY SEPARATE CONSIDERATION

The trial court dismissed ESCgov's claim for breach of the Non-Displacement Agreement after concluding that the Non-Displacement Agreement was not a valid contract supported by separate consideration. JA 1142. The district court based its holding on two factual determinations that are squarely within the province of the jury: (1) that BMC's non-displacement obligation was not a condition of ESCgov's purchase of the BladeLogic license; and (2) that the

Non-Displacement Agreement did not place a reciprocal obligation on ESCgov. JA 1142-44.  As previously stated, the trial court's interpretation of the parties' contract is subject to *de novo* review.  *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 710 (4th Cir. 2001)

### A.    At the time ESCgov Purchased the BladeLogic License from BMC, the Parties Agreed Not to Take Any Action to Displace One Another From the DISA Contract.

The trial court determined that ESCgov paid only what it already owed under the Perpetual License Agreement in exchange for BMC's execution of the Non-Displacement Agreement, but the court failed to consider evidence that BMC's non-displacement obligation was negotiated by the parties prior to the Perpetual License Agreement.  *See* JA 1144.  ESCgov's Vice President's detailed testimony regarding the dealings of the parties presented ample support for ESCgov's allegation that the non-displacement obligation was a necessary condition to ESCgov's purchase of the BladeLogic licenses.  JA 851-53.  As Mr. Zagurski explained:

> [F]rom ESCgov's perspective, and BMC certainly knew this, that there was going to be millions of dollars paid to BMC upfront and ESCgov's ability to collect those revenues to hopefully offset the millions of dollars paid to BMC upfront it would be necessary to have an agreement in place whereby ESCgov would at least have price protection in any subsequent contract opportunity with respect to DISA.  BMC was fully aware at the time.

*Id.*

Accordingly, ESCgov obtained BMC's commitment that during the First DISA Contract, and for a brief period thereafter, it would not intentionally assist anyone to displace ESCgov as the sole supplier of BladeLogic software to DISA nor would it offer non-standard discounted pricing on BladeLogic to anyone else. JA 60.  If BMC had not agreed to this condition prior to ESCgov's purchase of the licenses and acknowledged its agreement by executing the Non-Displacement Agreement soon thereafter, ESCgov would not have agreed to pay (and, ultimately paid) more than two million dollars for rights to the BladeLogic software—which could only be used to service DISA.  The written memorialization of the Non-Displacement Agreement that was prepared in December of 2012 merely confirmed the parties existing understanding reached prior to the execution of the Perpetual License Agreement a few months before.

## B. ESCgov and BMC had a Reciprocal Obligation under the Non-displacement Agreement not to Cause DISA to Abandon the BladeLogic Software

The evidence clearly shows that ESCgov had its own obligations to BMC under the Non-Displacement Agreement.   BMC confirmed that the Non-Displacement Agreement "looks like *a mutual commitment* . . . [t]o not do anything to cause customers to stop using BMC software purchased by ESCgov." JA 864 (emphasis added).  BMC also testified that "both sides" agreed to use their "best efforts to make sure that DISA kept using BladeLogic software as long as

possible." JA 865-66. Those mutual obligations were not mere aspirations. The Non-Displacement Agreement clearly provides that "neither party shall directly do anything to cause Customer [DISA] to stop using BMC's software purchased from ESCgov during the duration of the [First DISA Contract]." JA 60.

BMC even advised third parties of its commitment to ESCgov (under the Non-Displacement Agreement) to not to assist them in doing anything that may cause DISA to displace ESCgov as its BladeLogic supplier. JA 867-68. While others may have been deterred by knowing of BMC's commitment, "Deloitte decided they wanted to accept the risk and responsibility." JA 868.

The district court concluded that the only consideration provided by ESCgov in exchange for BMC's commitments under the Non-Displacement Agreement was the payment of the purchase price for the licenses, which payment occurred prior to execution of the Non-Displacement Agreement. JA 1144. However, the Non-Displacement Agreement clearly requires each party to maintain DISA's commitment to the BladeLogic product. *See* JA 60. For ESCgov's part, this meant that it had to perform exemplary service under the First DISA Contract so as to ensure DISA would mandate the use of BladeLogic in its later contracts (which DISA did, of course, by adding a requirement in the 2012 Solicitation that the bidder had to be an "authorized reseller of BMC BladeLogic."). The district court's

35

failure to consider the conflicting evidence regarding the parties' intentions and obligations was in error in deciding this issue on summary judgment.

## CONCLUSION

BMC simply got greedy. In its attempt to profit from the taxpayers having to purchase millions of dollars of redundant software that otherwise would not be needed, it conspired with Deloitte to mislead DISA into believing that ESCgov did not have the right to do what BMC itself admits it did . . . something explicitly permitted by the Perpetual License Agreement for which BMC was paid millions of dollars by ESCgov. Whether ESCgov truly was the kind of "authorized reseller" DISA wanted it to be is a classic question of fact to be decided by the jury that hears this case. Likewise, whether BMC's Non-Displacement Agreement with ESCgov was part of the deal that led to ESCgov's purchase of 20,000 BladeLogic licenses or whether it was supported by adequate consideration in the way of the parties' specified obligations to one another similarly are disputed factual issues that need to be decided by a jury. Because of that, and for the reasons set forth in greater detail above, ESCgov, Inc. respectfully requests that this Honorable Court reverse the ruling of the district court and remand the case for further proceedings to determine the full extent of BMC Software, Inc.'s liability to ESCgov.

## STATEMENT REGARDING ORAL ARGUMENT

Counsel requests oral argument in this case.

Respectfully submitted,

ESCGOV, INC.


/s/ Christopher A. Abel
Christopher A. Abel, Esquire (VSB #31821)
Stephanie N. Gilbert, Esquire (VSB #77140)
D. Sutton Hirschler, Esquire (VSB #85596)
Willcox & Savage, P.C.
Wells Fargo Center
440 Monticello Avenue, Suite 2200
Norfolk, Virginia  23510
Telephone: (757) 628-5500
Facsimile: (757) 628-5566

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*8,327*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: November 17, 2014                    /s/ Christopher A. Abel
                                                            *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 17th day of November, 2014, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Benjamin G. Chew
Joshua N. Drian
MANATT PHELPS & PHILLIPS, LLP
700 12th Street,NW
Washington, DC  20005
(202) 585-6511

*Counsel for Appellee*

T. Michael Guiffre
SQUIRE PATTON BOGG
2550 M Street, NW
Washington, DC  20037
(202) 457-6441

*Counsel for Appellee*

I further certify that on this 17th day of November, 2014, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Christopher A. Abel
*Counsel for Appellant*